The next case is Hominian v. Hussamuddin and Coyler and Isaacs. Good morning, Your Honors. May it please the Court, my name is Jeffrey Norton for the appellants. There are basically two issues on appeal here that are matters of critical importance as they touch upon the fundamental rights of union members as embodied in New York's labor law. To redress fiduciary abuses by union officials and agents, if affirmed, the district court's holding will have grave consequences for union members, for public sector unions, insulating union officials and agents from liability no matter how great the fiduciary breaches or how great the harm to union members. Now, there is two basis for the district court's dismissal, failure to allege demand futility with particularity and failure to meet the not-for-profit law 5% standing requirement. I want to address, in the interest of time, I'd like to jump to the second issue first, the alternative basis first. Because we believe that was in itself an egregious finding because the application of the 5% requirement here under New York's not-for-profit law, section 623, simply cannot be the case because it would eviscerate the protections of the LMIPA where these claims in this action arise. Now, the district court's holding is based on a single case of Clark v. Troy, a fourth department case, which the court found was on point. There is one sentence in Clark v. Troy in this one-page decision, one sentence, which says that the plaintiff, a pro se- I think ordinarily we would defer to an appellate division decision unless there's a clear reason to think that the New York Court of Appeals would decide otherwise. Is there a clear reason to think the New York Court of Appeals would rule otherwise on the conflict between 623 and 725? We do believe the Court of Appeals would- What's the basis for that belief? It's a multiple basis. One, on this case alone, there was zero discussion of any interplay between the LMIPA and the NPCL. The court didn't address it. Apparently, it was in some papers. On appeal, it wasn't addressed at the district court level. So this one sentence, it says, the complaint is not alleged. Plaintiff represents at least 5%. And that's the only- I realize that, but I'm looking for some reason to think that the New York Court of Appeals would rule otherwise. And my point is, Your Honor, that because this case does not discuss the interplay between the LMIPA and the NPCL, it's not on point. You're saying it just didn't really engage with that issue. There's no discussion of it. There's no discussion of statutory interpretation. There's no discussion of whether the LMIPA is the more specific statute, since it protects union members in New York and their ability of any member to proceed in a derivative action, whereas the NPCL is a statute, a general application. And if you're right about that, could you help me understand why you're entitled to bring a civil RICO claim under Labor Law 725? When I look at 725, I read, we're an officer, an agent, as violators violating any of his obligations provided in section 722 and 723. And when I look at 722 and 723, I see general kind of breach of fiduciary obligations. It doesn't necessarily seem broad enough to encompass a civil RICO action, a federal cause of action. And that's important to me, since that's the basis for federal jurisdiction here. So could you help me understand how you would be entitled to pursue a civil RICO action under the 725 scheme? Well, we don't believe that that precludes an action, a separate action under RICO. Because if you're standing in the shoes, as a derivative action, if you're standing in the shoes of the union, the union certainly had that standing to bring RICO action against. But the thing is that section 725 refers to a private right of action only for violations of 722 and 723 of the New York Labor Law. And that's when you're excused from the, you're outside of the 5% realm. You're in, you still have to show futility, but you're in the 720, in the New York Labor Law realm. What's- The reason that there are, the claims are broader than just that in this action. The claims are also brought against third parties that we wouldn't have necessarily that same standing to bring into 725. We've got the platinum partners and some of the other defendants that this is a broader conspiracy. And I haven't seen a case that says we can't do that. Yeah. It's still, it's striking in its specificity still that you're excused from demand, but only as to actions that are brought under 722 and 723. And those, as again, seem to be very focused. You know, have a required pecuniary or personal interest that's in conflict with this fiduciary obligations. It doesn't seem as far reaching as civil RICO. So you just say there's no authority to the contrary, so why not? That's, is that- As I can simply state it, we would accept that, yes. Thank you. Can I ask you to address demand futility? I understand your argument about that we shouldn't pay any attention to Clark. I understand the statutory argument. I understand your desire for certification. But ultimately, even if we get to the question of certification, that is only appropriate if the issue is determinative. And it doesn't appear to be here unless you get past the demand futility requirements. Right. Sure. I would address that quickly. I think the district court erred in two primary respects. On the factors under Marks v. Akers, under the first factor, whether the directors, the defendants, are self-interested. I think that the briefing speaks for itself, and I believe that we've alleged that with adequate particularity. And I could go through those matters of how Mr. Seabrook controlled the board and cemented their loyalty. The district court was incorrect in faulting us for group pleading because the law is fairly clear that if the defendants are all similarly situated, there's, don't need to be, have superfluous pleading by naming out each, every one. But even if particularity on the first Marks prong wasn't met, which we believe it was, on the second prong, it's inconceivable that we didn't meet that when the board here didn't fulfill their fiduciary duties of monitoring the funds. I mean, there's admissions on the record that they basically, they let Seabrook do whatever he wished, whereas the bylaws in New York law provide that they had a non-delegable duty to oversee these funds and make sure they were managed correctly. The district court erred by couching this more as a failure to investigate claim, but it's not a failure to investigate claim. It's a failure to have any mechanisms whatsoever in place to, that would have caught what happened, that 20% of the general annuity fund and 40% of the general fund are invested in a Ponzi scheme, which the union's own lawyers found to be, you know, no other prudent union had invested in these. But why don't we be trendsetters? Unions shouldn't be trendsetters. Thank you. Good morning. May it please the court, Nathaniel Charney with the firm Charney and Wheeler. I am appearing on behalf of the COBA, the entity, the COBA annuity fund, as well as the executive board, appellees, not including Mr. Seabrook, who has his own counsel. Judge Carney nailed it right off the bat. I agree with you, Judge. Claims four, five, six, and seven, they're gone right off the bat. There's no scenario those claims survive. They're just gone. But why shouldn't they have a chance to proceed in state court on those state law claims? I mean, why should those be dismissed with prejudice, as the district court did? Because we have a state law, you know, competing regimes of the nonprofit law and the labor law, and taking the approach the district court did, those are all wiped out. Well, I think the state law, the 5 percent rule is actually very, there's great clarity to it. As with Judge Etkin, I don't see a problem or a dispute. The 5 percent rule, you know, the LMIPA states in it at Section 731C of the labor law, Section 731C says in it, this is ten years before the not-for-profit corporation law was even written, it says at Section 731C sub 1, nothing contained in this article shall be construed to relieve any member, agent, representative from compliance with any other provision of this chapter or any other applicable state law. So the labor law specifically invokes the future idea ten years from now that if you're a not-for-profit labor union, you have the 5 percent rule. Wait, so you believe that anticipated the 5 percent rule passed later? I think. And said you can't be excused from that? It anticipated that the legislature may or may not add additional requirements to people and members who want to effectuate rights under the statute. I would be reluctant to construe that to anticipate a specific requirement that seemed contrary to the purpose of this overall, of this statute, you know, which mimicked the LMRDA and which seemed to look for ways to allow individuals to enforce the fiduciary obligations of people in charge of their money. I understand, Judge, and I apologize if I implied that I thought they thought there may be this 5 percent rule into the future. What the state legislature and the governor, when the governor signed the labor law, what they were anticipating is there might be future requirements imposed. There might be, or that would additionally be obligatory to any member. It says any member still has to comply with any other statutes. Ten years later, the legislature and the governor saw fit to implement a 5 percent rule. Now, Radzenauer, actually, the Supreme Court case Radzenauer is quite interesting on this point. And the reason why is because that's the case where there's the national banking law and the securities exchange act. There are two different provisions. One says very limited venue and one says very broad venue. And what the Supreme Court ruled is the two can be read together. You just have to do the more limited venue. That's what Radzenauer stands for. That's what's happening here. There's clarity to this. The two can be read together. Members don't lose. Mr. Norton wants us to conclude, wants Your Honors to conclude that there's an insulation from liability. Of course there's not an insulation from liability. They just have the 5 percent rule if they want to do it against a not-for-profit in a derivative. If we wander into this territory, isn't this precisely the sort of question that the New York Court of Appeals would be better positioned to answer than we are? Well, and in that vein, Your Honor, I would remind you of the Expressions Hair Design case. I believe that Judge Livingston and Judge Carney were on that panel. That's a 2017 case. I presume you remember it. And in that case, you certified it to the Court of Appeals. And the question was the interpretation of a specific credit card law regarding, I forgot what it was about. But in that case, both of Your Honors concluded that there was no law, there was no law whatsoever, and it would be impractical for you to then do a First Amendment constitutional analysis with no state law at all. Here we have Clark v. Troy. But in Clark v. Troy, you've got to agree that there's no reasoning offered. We have one paragraph. We have a pro se litigant. We have a highly undeveloped argument. And there's no rationale provided for the bottom line. And I don't believe that that's a sufficient base to ignore it or to require additional. Are we required to defer to that? I think you are required to defer to the reality that there is no contrary case law. You have this appellate division case on point, albeit with limited analysis. It's on point. You have the Section 731 provision in the labor law that I think that I offer compels the conclusion that they're obligated to follow this rule. These involve potentially competing state statutory regimes. The New York Court of Appeals is in the position best suited to resolve that. And given that there was very little analysis here, I wonder how much weight we should give it. Well, if I may, with your indulgence, proceed very quickly in response. To pivot a bit, I think Judge Livingston, I would remind what Judge Livingston just said in a moment. Well, who cares? Because it's not determinative. You still have to get to pleading demand futility with particularity, which there was a complete and total failure to do here. And I would just want to say one thing on that. Well, two things, if I may, and I appreciate your indulgence. It's interesting that the appellants in the matter regarding pleading futility, they rely on Barr v. Waxman, which is the 1975 Court of Appeals case that they argue stands for the proposition that there's essentially a per se rule about pleading futility. And then Barr was very, very limited a handful of years later by Marks v. Akers. In 1996, the Court of Appeals literally says, they said, oh, my God, you have all for years been misunderstanding the Barr case. They say, we now deem it necessary to offer the following elaboration. And then they go on to say, look, it is not sufficient merely to name a majority of the directors with conclusory allegations. So there's very little reliance on Marks in their papers. There's reliance on Barr, which the Court of Appeals was very clear has been misunderstood for decades. Thank you very much, Judge. May it please the Court. Reed Borodsky from Gibson, Dun and Crutcher on behalf of external counsel to COBA, Calder, and Isaacs. And this court should affirm Judge Etkin's well-reasoned opinion dismissing COBA's amended complaint, the amended derivative amended complaint by the appellants on two independent grounds. And Your Honor heard a little bit about both of them. The first I'd like to talk about is the failure by the appellants to plead demand futility with any particularity at all. As Judge Etkin found, what the appellants failed to do as required under Federal Rule Procedure 23.1 and New York's substantive law is to plead with particularity that any demand on COBA's board would be futile because a majority of the board of directors were, quote, controlled by a self-interested director or that the board did, quote, not fully inform themselves about the challenge transaction to the extent reasonably appropriate under the circumstances. Even today, the appellants failed to articulate anything but a conclusory allegation with respect to both. With respect to their allegation that the majority of the board was self-interested, what they rely upon is Delaware law. In their reply brief, they turn to Delaware law and the standard on Delaware law in the Delaware Supreme Court opinion and rails to make their claim that they've pleaded demand futility with sufficiency. However, as Your Honors know, in the New York Court of Appeals decision in Marx, the Marx decision expressly rejected the reasonable doubt standard under Delaware law. They called it, quote, overly subjective, thereby permitting a wide variance in the application of Delaware law to similar facts. What the New York Court of Appeals set forth in Marx is that you need more than just conclusive assertion of self-interest. Here, all the appellants have alleged is that there was a power by Norman Seabrook, the head of the COBA board, to control them. There was a power that he had without alleging any particular threat, any particular evidence, any particular allegation that in fact Mr. Seabrook controlled them. They also allege in broad sweeping fashion that holiday gifts, annual holiday gifts, are somehow the mechanism by which Mr. Seabrook controlled them. But the allegation was completely implausible, as Judge Etkin found, that the holiday gifts were nonspecific, they were very general, there were no, one is left to guess as to the when these gifts were given, how much, who paid what, what expenses were paid for, if any, and they can't meet the standard. With regard to, I mean, it still is striking that the numbers that were just acknowledged, the 60% of the general fund and 20%, maybe, if I have this right, of the special fund were all invested in this one, with this one fund, which is really a striking misallocation of resources or failure to allocate. And Mr. Seabrook controlled the Board for 20 years. They, there's just an irreconcilable, these irreconcilable facts, I would say. I mean, either the Board failed to inform themselves or they were willfully blind. I mean, I just can't understand how it can be understood in another way. And so, I'm having difficulty imagining what exactly would need to have been done by the plaintiffs in order to satisfy the demand requirement with the particularity that you are urging us to adopt. Well, three responses to that, Your Honor. First, what the appellants allege is that there was an annuity subgroup of the Board that approved two out of the three allocations of money to the Platinum Fund. And there were 11 other members of the Board that the plaintiffs could have taken their claims to, who the plaintiffs assert were not involved in any of the allocations, either the allocations by the annuity subgroup or the allocation by Mr. Seabrook from the general fund to Platinum Fund. So, they had the ability to take their claims to the 11 other members who, according to their amended complaint, had nothing to do with the actual decision to allocate. What they then rely on, not to go to the 11 Board members, is this unspecified assertion that there was a nondelegable duty by the Board members to monitor the investments. And they attach to their complaint a constitution in the bylaws of COBA and generally rely on that. But there is no specific constitutional or bylaw requirement of COBA that all the Board members had to monitor every dollar spent. What they rely on is . . . I'm not talking about every dollar spent. I'm talking about an allocation that's so grossly disproportionate that it would kind of leap off the page to anyone who looked at the balance sheet. There was no requirement under the bylaws or the constitution that the Board members as a group could not delegate to a subgroup the responsibility to make an allocation decision. And they could turn to the 11 Board members who were not involved in this decision, and they could ask them to bring claims and take their claims. That is the entire purpose of demand futility. But they didn't do that. They decided to move ahead. And I think the case law is very, very clear, as Judge Etkin relied on. For example, in Wandel, the court said failure to plead with the requisite particularity that the directors had specific information or reason to inform themselves about the details of the allegedly wrongful conduct. In that case, it was backdated stock options. Just like in Wandel here, there is no allegation that the 11 Board members, who the plaintiffs say had nothing to do with the allocation to Platinum Fund, had any reason to inform themselves about the allocation. The general assertion that they should have done it just because they were Board members is not sufficient, as Judge Etkin found. Moreover, Your Honors, if you turn to, and finally, Your Honor, what I would say is that the only part of the bylaws that the plaintiffs rely on is one treasurer. A mechanism in the bylaws that one treasurer had to approve the transfer of money. But one treasurer, one Board member, even assuming their allegations are true, does not preclude them from taking their complaint to 11 other Board members who had nothing to do with the allocation. The other independent ground that the appellants failed to satisfy is non-profit law section 623. Now, I know there was discussion about this. What the appellants or the plaintiffs failed to do is they failed to suggest or show how the New York Court of Appeals would decide Clark v. Trois any other way. Yes, admittedly, it is a short opinion. But nothing in the law requires a court of appeals, the New York Court of Appeals, to flesh out their opinion. But there's very little reasoning. Go ahead, please. Yes, Your Honor, there's very little reasoning. But the facts are squarely on point. There can be no denial that the facts in Clark v. Trois could not be more squarely on point. It is an intermediate appellate court. It's not the court of appeals. But the facts show, was an allegation, that this union and an outside law firm allowed the former president to use money and lease an automobile for his own personal use. Thank you. Thank you very much. Thank you, Your Honor. So I'll quickly go back to the point about the possible conflict between the LMIPA and the NPCL. We don't believe there actually is a conflict. We believe that these two statutes can coexist, that the LMIPA actually provides an alternative basis for standing for union members, that it would not do harm to the NPCL to, in the union context, to allow claims that arise under the LMIPA for any member's standing. So we don't believe that there's an irreconcilable conflict, and obviously the statutory laws, statutory construction. Let me draw your attention again back to whether demand futility has been adequately alleged, setting aside the potential conflict between these two statutes. Your adversaries have just said their 11 board members weren't involved in the PPVA investments directly. You could have made a demand on them, and that you failed to allege why either self-interest or a failure to inform themselves provide a basis for you to skip that step. The New York Court of Appeals has held that a directorship cannot be a mere position of honor void of responsibility, and that was in the Barr v. Wackman case. The executive board has a role, and ultimately they have a non-delegable duty. If they decided to select some investment advisors or a nudity subcommittee, that doesn't mean they could abdicate all responsibility. Ultimately, these individuals are the fiduciaries for these plans. They had no mechanisms in place whatsoever to catch a 40 percent investment in one fund, a 20 percent investment in the other. So whether or not you brought this to their attention, they're not just sitting waiting for people to complain. They have an ongoing duty to have mechanisms in place, and they failed in that duty. Why does that make it futile if they had an ongoing obligation? If there were 11 who were not personally responsible for the investment decision, why could they not? They were responsible. They are responsible. The monies that go out of that fund are the responsibility of the executive board. The fiduciaries are in place to monitor those things, to protect the union. It's not their responsibility to just allow Norman Seabrook to go off and invest what he wants. In the FBI report, the indictment against Norman Seabrook said that. Basically, it said, yeah, the nudity subgroup meant nothing either, because Maiello, who was the treasurer and also a member of this nudity subgroup, specifically told the FBI, yeah, Norman Seabrook does what he wants to do. We had no—he doesn't come to us for anything. So that's not a grounds for saying that they're relieved of responsibility because they sit idly by. The question is, how does that satisfy the requirement that you plead with particularity that demand would have been futile? And the fact that they had a responsibility, an overarching responsibility, doesn't necessarily suggest that demand will have been futile. Well, the fact is they violated their fiduciary duties under the bylaws and the Constitution, which we do allege in the complaint and which the FBI also made note of in the sealed indictment. So that's—they failed to advise themselves under the circumstances. So that's one prong. So that in and of itself, that breach satisfies the second prong of Marx. Under the first prong, I think they woefully understate the control that Norman Seabrook, who, as you mentioned, had been on this board, had controlled COBOL for 20 years. He installed each and every one of these individuals on the executive board. He cemented their loyalty with KUSH job assignments, keeping them from Rikers Island, another thing that came out of the FBI report. And these individuals knew that Seabrook had the power to remove them if he so chose. So this—the quintessential case on kind of like this self-interest, level of self-interest and board dominance is the Rails case out of Delaware, which Marx cites as well. And this case is Rails. In Rails, the brothers ran the company. They ran other companies that these board members sat on. And in Rails, the Supreme Court of Delaware said that was enough. That was enough to show that they lacked independence, to make independent decisions when they were so loyal to the Rails brothers. Thank you very much for your time. Thank you all for your arguments, and we'll take the matter under advisement.